**THE MARLEY COOLING TOWER COMPANY Plaintiff**

v.

**CALDWELL ENERGY & ENVIRONMENTAL, INC. Defendant**

No. CIV.A.3:02CV–32–H.

United States District Court, W.D. Kentucky.

Aug. 30, 2003.

Lester I. Adams, Jr., Ronald L. Gaffney, Pedley Zielke Gordinier & Pence, PLLC, Louisville, KY, for Plaintiff.

Robert M. Connolly, Stites & Harbison, Louisville, KY, for Defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff Marley Cooling Tower Company ("Marley") and Defendant Caldwell Energy & Environmental, Inc. ("Caldwell") filed cross-motions for summary judgment. Both sides contend that the main issue is whether the Caldwell–Marley agreement entitles Caldwell to hold Marley liable for losses it sustained as a result of Marley's late delivery. Having reviewed the contract and the type of damages Caldwell incurred, the Court concludes that the broad provision in the Caldwell–Marley agreement waiving Marley's liability for "consequential damages" covers the late charges Duke/Fluor Daniel ("D/FD") assessed against Caldwell. Additionally, the Court concludes that Marley did not waive its rights under the contract. The Court will therefore sustain Marley's motion for summary judgment and deny Caldwell's cross-motion for summary judgment.

### I.

The facts in this case, although lengthy, are not significantly disputed. Caldwell designs, manufactures and installs industrial cooling systems for large turbine generating systems used in power plants. On June 7, 2000, Caldwell and D/FD entered into an agreement under which Caldwell

would provide D/FD a cooling system for an Aiken, South Carolina power plant. Caldwell guaranteed D/FD that they would receive a completed, operational cooling system to D/FD's South Carolina job site by April 1, 2001.

This case centers on a subsequent agreement between Caldwell and Marley. That agreement stated that Marley "shall have all the material/equipment [for the South Carolina cooling system] delivered to the purchaser [Caldwell] to the 'Ship To' address on April 1, 2001. This is a tentative delivery date and is subject to change *only* by the [Caldwell] Project Manager." *Caldwell–Marley Contract*, Attachment A at ¶ 5.1 (emphasis in original). The agreement further provided that "[n]o changes in ... delivery may be made without a written change order, signed by authorized representative" of Caldwell. *Id.* at ¶ 4. The necessity of the April 1, 2001, due date cannot be seriously disputed.[1]

It soon became clear that Marley could not complete its deliveries on-time. Realizing a late delivery was inevitable, on January 9, 2001, Marley notified Caldwell that it would be unable to comply with its contractual obligations. Similarly, on February 28, 2001, at a teleconference among Pope, Hubbuch, and other representatives from both companies, Ron Teson, Marley's Project Manager, stated that a late delivery was likely and suggested an April 16, 2001, delivery date was more probable.

Unhappy with the prospect of a late delivery, Caldwell restated its position that any delivery date after April 1, 2001, was unacceptable. Furthermore, Caldwell stated that it would hold Marley responsible for "any costs that Caldwell incurs as a result of late delivery." *Letter from Mike Pope to Mike Hubbuch,* March 7, 2001, at ¶ 1; ¶ 3. Teson responded that Marley would "not be able to accelerate the delivery date of April 16." *Letter from Ron Teson to Mike Pope,* March 12, 2001. Teson further explained that regardless of whether the late delivery date led to charges against Caldwell, Marley was not responsible for those charges under the Caldwell–Marley contract. As support for this claim, Teson relied on paragraph 4 of the Caldwell–Marley agreement which stated "Neither The Marley Cooling Tower Company or the Purchaser shall be responsible or held liable for any special, indirect, consequential, liquidated and/or punitive damages."

Marley did not complete required delivery by the April 1, 2001, due date. Indeed, it only began shipping cooling tower materials on March 19th and staggered additional shipments thereafter until the work was completed on May 30, 2001— nearly two months after Marley promised to complete the project. Throughout this period, Caldwell continued to remind Marley of its liability for any costs or backcharges D/FD imposed because of the late delivery.

The D/FD–Caldwell agreement established liquidated damages of $5,000 per day for late delivery of components to the South Carolina job site. As a result of this series of events, on June 18, 2001, D/FD demanded liquidated damages from April 9, 2001 to May 6, 2001, under the D/FD–Caldwell contract. Consequently, D/FD assessed $135,000 in liquidated damages through a set-off or "backcharge" on its next invoice. Caldwell passed this backcharge along to Marley in a July 3, 2001, letter, stating that it would set-off the

---

1. Caldwell Project Manager Mike Pope sent a fax to Mike Hubbuch, the sales representative for Marley in Louisville, to confirm the delivery date. At that time, Hubbuch responded with an e-mail, stating that shipment would occur "on or about 4–2–01." *Email from Hubbach to Moradel,* December 14, 2000.

$135,000 against any future Marley invoices.

The total Caldwell–Marley contract price was $407,003. On May 7, 2001, Marley submitted its first invoice in the amount of $127,811.97. Caldwell paid $126,533.85, because the invoice allowed Caldwell to deduct one percent from the total if paid within 20 days. Marley now says that Caldwell failed to pay the amount it owed in full. However, Marley made no objection at the time. On June 25, 2001, Marley submitted a second invoice in the amount of $258,840.88. Because D/FD had now backcharged Caldwell for Marley's late delivery, Caldwell passed along the $135,000 charge against Marley when it paid that invoice.

Whether Marley agreed to accept this $135,000 backcharge is a matter of dispute. Initially, when Teson received Pope's July 3 letter, he spoke with several persons at Marley about whether Marley should accept the backcharge. Marley vice-president Don Meltzer thought the company should pay and instructed Teson to notify Caldwell that, if it could provide certain documentation concerning the backcharge, Marley would cover the costs. Teson apparently objected to what he termed an "about-face," but complied with Meltzer's request. On July 20, 2001, Teson sent Pope a letter asking Caldwell to supply portions of the Caldwell–D/FD contract and to provide a letter signed by a Caldwell officer stating that Caldwell had been assessed liquidated damages and that Caldwell had done everything possible to question the validity of the damages. The letter concluded, "We would like to work with you to resolve this issue. However, before we can agree to these backcharges, we must have the documents noted above." The letter did not state that Marley objected to accepting the backcharge.

On August 1, 2001, Caldwell President John Kraft responded to this letter by providing Teson with copies of the relevant documents he requested. *Letter & Enclosures from Ron Teson to Mike Pope,* July 20, 2001. Kraft also sent a change order formalizing the decision to accept the $135,000 charge. The change order stated, "This Change Order No.1 is issued to deduct the $135,000 in backcharges for late delivery." *Id.* The change order had unsigned signature lines for Caldwell and Marley. It stated at the bottom, "This contract change order shall not be valid until signed and dated by Caldwell Energy & Environmental, Inc. Signature by the Subcontractor/Vendor [Marley] indicates agreement herewith including any changes to the contract amount and/or contract time." *Id.* Marley neither signed nor returned the change order.

Throughout August, Caldwell and Marley continued to correspond regarding the $135,000 backcharge. On one occasion Teson told Meltzer that, if Caldwell had sent the requisite documents Marley requested, then Marley should go ahead and agree to the backcharge. (R. Teson Depo. pp. 92–94.) Soon thereafter, however, Meltzer told Teson he would sign the change order in September for financial reporting purposes. On September 5, 2001, Meltzer resigned. He had not yet signed the change order. By September 25, 2001, Caldwell had still not received the written change order and telephoned Teson again. Teson informed Pope that Marley was awaiting new administration, but that, once the new president arrived, Caldwell would sign the change order.

After Meltzer's departure, the decision to sign the change order was referred to Lee Royle, Marley's controller. In a letter dated October 10, 2001, Royle wrote Pope to inform Caldwell that he was denying the change order request. Specifically, Royle

stated, the "contract expressly excludes any liability for special, indirect, consequential or liquidated damages ... Therefore, the remedy of special or liquidated damages is not available under the contract, even if a breach can be proved ..." *Letter from Lee Royle to Mike Pope,* October 10, 2001. Additionally, Royle's letter also stated that Caldwell was not entitled to the early pay discount because, by not paying $135,000 of the invoiced amount, Caldwell had not paid the amount in full within 20 days of being invoiced. *Id.* As such, Royle demanded Caldwell pay the remaining balance of $137,477.68, which included the discount previously deducted. *Id.*

For whatever reason, this letter did not reach Pope in a timely matter and so, on October 18, 2001, he inquired about the change order's status. Teson referred Pope to Royle who stated that he would fax the letter. On October 19, 2001, after Royle had sent Caldwell the letter denying that it would pay the backcharge, Marley submitted a final invoice to Caldwell. That invoice stated that the final amount due was $20,350.15. The final balance did not include the backcharge and early pay discounts Caldwell had previously taken. For this reason, Caldwell assumed that Marley had accepted the backcharge and early pay discounts.

After considering this last invoice, on December 21, 2001, Caldwell paid Marley $20,350.15 for the full amount billed in the third and final invoice. Marley accepted this last payment without objection. On January 16, 2002, Marley filed this lawsuit alleging that Caldwell breached the Caldwell–Marley contract by deducting the $135,000 and the two early pay discounts.

## II.

The Court begins by briefly addressing the procedural context in which the damages question is raised. This is important because, among the arguments Caldwell makes in its defense is its assertion that Marley breached the contract first. As a result, Caldwell says, Marley cannot sue for Caldwell's alleged subsequent breach.

■■■ As a factual matter, the Court agrees with Caldwell. In this case, the first breach allegedly occurred when Marley delivered the cooling tower to the South Carolina site after the April 1, 2001, deadline. Neither party offers any evidence to dispute the fact that (1) the contract plainly called for an April 1, 2001, delivery date, and (2) Marley completed delivery by May 30, 2001—nearly two months after the agreed upon date. In Kentucky, failure to deliver by a deadline will not itself amount to a material breach, unless the contract indicates that performance of an offer to perform by a particular day is important. *Browning v. Huff,* 204 Ky. 13, 263 S.W. 661 (1924). In this case, the Contract plainly stated that "[t]ime is of the essence on this Order. Delivery of this Equipment and/or Materials and performance of this service constituting the Work contemplated hereunder must be made within the time specified in this Order." *Caldwell–Marley Contract,* at ¶ 2. Marley did not comply with this deadline and, tellingly, other than arguing that the contract requires a written order to modify its terms, does not really dispute the breach. The Court therefore concludes that Marley materially breached the contract first. *See, e.g., Retrofit Partners I, L.P. v. Lucas Indus.,* 201 F.3d 155, 160 (2nd Cir.2000) (noting that "insofar as a time for performance is specified in the contract, failure to comply with the time requirement will be considered to be a material breach of the agreement").

■■■ The Court next considers whether Marley may nevertheless enforce the

contract and order Caldwell to pay the outstanding amount due. When one party commits a material breach, the other party may elect between two rights. It can either allege a total breach, terminate the contract and bring an action, or the non-breaching party may elect to keep the contract in force, declare the default only a partial breach and sue to recover those damages caused by that partial breach. 13 Richard A. Lord, *Williston on Contracts*, 4th ed. § 39:32 at 645 (2000); *ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643 (2nd Cir.1991). A non-breaching party, however, after "electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain." 13 *Williston on Contracts, supra*, at 645.

■ In this instance, although it is true Marley breached the contract first, Caldwell did not terminate the contract. Instead, Caldwell accepted the late delivery. Having done so, Caldwell still had the option to sue to recover any damages it sustained, but it was not entitled to accept Marley's performance and then simply refuse to pay the contractual price. This, however, is exactly what Caldwell did. As a result, the Court concludes Marley was within its contractual rights to demand Caldwell's performance. Finding that Marley may enforce the contract, the Court turns to the question of damages.

### III.

■ The principal question in this case is whether the $135,000 penalty Caldwell passed on to Marley amounts to "special,

indirect, consequential, liquidated and/or punitive damages" or whether they are something else.[2] This classification will determine the issue of damages because, if the $135,000 penalty is not covered by this broad clause in the Caldwell–Marley contract, then Marley is liable for Caldwell's loss. In the alternative, if the $135,000 does fall into one of these categories, Marley is entitled to payment under the contract terms and prices.

■ In addition to allowing parties to contract *for* liquidated damages, Kentucky law also expressly guarantees the right of parties to provide contractually *for the limitation* of damages in the event of a party's breach. Ky.Rev.Stat. Ann. § 355.2–718(1) (Baldwin 1983). The problem here, as Caldwell contends, is that while the parties permissibly agreed to exclude recovery for liquidated damages, they did not first explain what those damages encompassed. The term "liquidated damages" is not defined. However, the term has a well-known meaning. Liquidated damages are "the sum which [a] party to [a] contract agrees to pay if [it] breaks some promise and, which having been arrived at by good faith effort to estimate actual damage that will probably ensue from breach, are recoverable as agreed damages if breach occurs." Black's Law Dictionary 353 (5th ed.1979); *see also Mattingly Bridge Co. v. Holloway & Son Constr. Co.*, 694 S.W.2d 702, 705 (Ky.1985) (adopting the language of the Restatement (Second) of Contracts § 356(1) which provides that damages "may be liquidated in the agreement but only at an amount that is reasonable in the

---

**2.** The Caldwell–Marley contract contains a valid choice of law and choice of venue provision providing that Kentucky law should be applied and that this Court is one of the two proper venues for bringing this action. *See Caldwell–Marley Contract,* at ¶ 15. Such

choice of law provisions in commercial, arms-length contracts are valid. *Wallace Hardware Co. v. Abrams,* 223 F.3d 382 (6th Cir.2000). For these reasons, the court applies Kentucky contract law to analyze this case.

light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss"). Here Caldwell's $135,000 loss resulted from a liquidated damage.

When Caldwell entered into the agreement with Marley and included the "time is of the essence" provision, it knew that it might suffer damages if Marley delivered late. Moreover, Caldwell knew that these could be "liquidated damages" as a consequence of its agreement with D/FD. For whatever reason, however, Caldwell chose not to protect itself in the event Marley delivered late by excluding Marley's liability for all "liquidated damages." Whether or not the parties defined that term, there is no question of their intent. The contract language leaves no room for doubt. The Court concludes that the term "liquidated damages" unequivocally includes the losses Caldwell sustained as a result of its contract with D/FD and, as a result, Caldwell may not hold Marley liable under the terms of the Caldwell–Marley agreement.

 The Court notes that Marley has also accurately portrayed the loss in this case as a "consequential damage."[3] Under Kentucky law, consequential damages "include those damages that, although not an invariable result of every breach of this sort, were reasonable foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach." *Williston*, § 64:12.[4] The key difference between direct and consequential damages is that consequential damages do not always follow from a breach of a particular type of agreement; they "arise from circumstances peculiar to the particular case ..." *Kentucky Consumers Oil Co. v. General Bonded Warehousing Corp.*, 299 Ky. 161, 184 S.W.2d 972, 974 (1945); *see also* UCC § 2–715(2) (defining consequential damages to include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know which could not reasonably be prevented by cover or otherwise). The Court finds the $135,000 in damages Caldwell sustained as a result of Marley's breach were also "consequential damages" and therefore not recoverable under the contract's express terms.

In this case two sophisticated parties represented by counsel included a provision excluding Marley's liability for all "special, indirect, consequential, liquidated

---

**3.** Caldwell correctly notes that the Court is to begin its analysis with the overarching premise that, in Kentucky, "compensation is always the aim of the law." *Hughett v. Caldwell County*, 313 Ky. 85, 230 S.W.2d 92, 95 (1950). Consistent with that basic principle, Kentucky law provides that the "object of compensatory damages is to make the injured party whole to the extent that it is possible to measure his injury in terms of money." *Kentucky Central Ins. Co. v. Schneider*, 15 S.W.3d 373, 374 (Ky.2000). Compensatory damages come in many forms, including as subsets both direct and consequential damages, which are both used as remedies to make the non-breaching party whole again. An exception to this broad liability for all reasonable foreseeable damages, however, says that two parties to an agreement may "expressly or by

implication, fix the rule by which the damages are to be measured." *Id.* at 543. Consistent with this premise, the Kentucky legislature has adopted § 2–719(3) of the Uniform Commercial Code, which allows parties to a commercial contract—such as the Caldwell–Marley contract—to agree to exclude liability for consequential damages so long as the exclusion is not unconscionable. KRS 355.2–719(3). In this case, it is undisputed that Caldwell and Marley did just that when they included a clause in their contract which expressly stated "special, indirect, consequential, liquidated and/or punitive damages" were not recoverable.

**4.** Importantly, unless expressly excluded, consequential damages are usually recoverable so long as they are foreseeable.

and/or punitive damages." Once this provision was included, Marley knew it was not liable for any losses Caldwell sustained beyond direct damages. Consequently, the parties clearly made it Caldwell's burden to, among other things, purchase insurance, negotiate a better liquidated damages agreement with D/FD, make arrangements for a possible alternative supplier, or include a clause in the Caldwell–Marley contract that would have the effect of charging a late fee. For whatever reason, Caldwell did not take any of these actions, despite the fact both parties gave it this burden. Instead, it has now elected to recast its "liquidated damages" and "consequential damages" as "direct damages" in hopes of bootstrapping them into Marley's more limited liability. The parties, however, did not contract for that outcome.

## IV.

Last, the Court must address Caldwell's contention that Marley's actions in suggesting it would execute a change order amounted to either a contract modification or a waiver of Caldwell's breach. Caldwell bases this claim most strongly on an August 21, 2001, telephone conversation in which Marley's Teson communicated to Caldwell's Pope that Marley would agree to accept the $135,000 backcharge but had not yet signed it. The Court, however, concludes that this oral communication is simply not enough to equate to either a contract modification or a waiver by Marley.

As a starting point, the Court notes that the Uniform Commercial Code applies in this case. The UCC applies to transactions in goods, including mixed contracts for goods and services where the predominant factor is the sale of goods. KRS 355.2–102. Kentucky has adopted Article 2 of the UCC, governing sales, and codified that part at KRS 355.2. Two parts of the UCC largely dictate the outcome here. First, section 2–209(2) of the UCC is clear that, as to modification, a "signed written agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." KRS 355.2–209(2). Under this section Marley and Caldwell cannot modify their agreement orally, or through conduct, since their Agreement plainly stated "[n]o changes in . . . delivery may be made without a written change order, signed by authorized representative" of Caldwell. *Caldwell–Marley Contract,* Attachment A at ¶ 4. Numerous other courts have interpreted this part of the UCC to bar contract modifications contingent on similar facts. *See, e.g., American Suzuki Motor Corp. v. Kummer, Inc.,* 65 F.3d 1381, 1386 (7th Cir.1995).

A second part of the UCC, however, acts as an exception to this rule. Specifically, section 2–209(4) of the UCC provides that an "attempt at modification" which does not satisfy the contractual requirement that modifications be in writing can nevertheless "operate as a waiver." Unlike attempts to modify a contract, "[s]uch a waiver under the Uniform Commercial Code may take place through conduct as well as words." *Federal Exp. Corp. v. Pan American World Airways, Inc.,* 623 F.2d 1297, 1302 (8th Cir.1980); *Wehr Constructors, Inc. v. Steel Fabricators, Inc.,* 769 S.W.2d 51, 54 (Ky.App. 1988); *See also* UCC 2–209, cmt. 4 ("[s]ubsection (4) is intended, despite the provi-

sions of subsections (2) and (3), to prevent contractual provisions excluding modification except by a signed writing from limiting in other respects the legal effect of the parties' actual later conduct."). The Court must therefore determine whether, under Kentucky's application of the UCC, Marley's actions amounted to a waiver of its right under the contract to require any change orders to be put in writing.

▮ Waiver is not defined in the UCC, but its meaning is well established under Kentucky law. "Waiver is the intentional relinquishment of a known right," *FS Invs., Inc. v. Asset Guar. Ins. Co.*, 196 F.Supp.2d 491 (E.D.Ky.2002), and "may be implied from conduct inconsistent with the assertion of that right." *Id.*[5] In this case, the Court concludes that not only did Caldwell fail to suffer any detrimental reliance, but, more significantly, Marley's actions simply do not amount to an "intentional relinquishment" of its rights.[6] On balance, while it is true that Marley orally communicated that it would pay the $135,000 backcharge, this communication when balanced against all of Marley's other actions and the fact the contract required a written change order, which was never executed, cannot amount to an intentional relinquishment of Marley's right to enforce its contractual obligations.

At best Marley was ambivalent about agreeing to a change. On March 12, 2001, Marley communicated to Caldwell in writing that it would not accept responsibility for Caldwell's liabilities to D/FD due to the late delivery. Similarly, even *after* Marley stated orally that it would accept the backcharge, it was Caldwell that drafted the documents necessary to effectuate the change. In those documents, Caldwell's draft of the change order stated, "This Change Order No.1 is issued to deduct the $135,000 in back charges for late delivery." The change order had unsigned signature lines for Caldwell and Marley. It stated at the bottom, "This contract change order shall not be valid until signed and dated by" both parties. Marley neither signed nor returned the change order to Caldwell.

Neither party disputes the fact that the Caldwell–Marley contract itself required a written change order to modify the contract or to reduce the price due under the contract. No such action was ever taken and the Court is very reluctant to override this requirement based on one phone call.

---

5. As the Kentucky Court of Appeals explained in *McDonald v. Burke*:

 The rule is well recognized that where a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts remains inactive for a considerable time or abstains from impeaching a contract or transaction, or freely does what amounts to a recognition thereof as existing, or acts in a manner inconsistent with its repudiation and so as to affect or interfere with the relation and situation of the parties, so that the other party is induced to suppose that it is recognized, this amounts to acquiescence and the transaction, although originally impeachable, becomes unimpeachable.

 288 S.W.2d 363, 367–68 (Ky.1956).

6. Typically, the first step in such an analysis requires that the Court determine whether, under the UCC, waiver must be accompanied by detrimental reliance. "Courts disagree on whether the UCC retains this requirement." *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322 (11th Cir.1998). *Compare Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280 (7th Cir.1986) (concluding that waiver requires reliance under the UCC) *with BMC Indus.*, 160 F.3d at 1334 (concluding that waiver under the UCC does not require detrimental reliance). In this case, as a practical matter, there is simply no evidence that Caldwell suffered any losses pursuant to any detrimental reliance on Marley's August oral statement. Rather, any losses Caldwell might have suffered as a result of Marley's actions accrued well before Marley ever indicated a willingness to consent to the change order.

Finally and perhaps most importantly, even if Marley did execute a waiver, the UCC plainly allows a party that makes a waiver to retract the waiver by notifying the other party that strict performance is required. KRS 255.2–209(5). The only exception to this rule is that Marley may not retract any alleged waiver if doing so is unjust in light of Caldwell's material change of position in reliance on the waiver. *Id.* There was no detrimental reliance here and Marley ultimately clearly reiterated that it intended to enforce the contract. The Court finds no reason to deviate from enforcement of the contract as written.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The parties have filed cross-motions on the entry of the consent judgment The Court has reviewed the evidence and has filed a Memorandum Opinion. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment is SUSTAINED and Marley is entitled to full payment under the terms of the contract. Defendant's cross-motion for summary judgment is DENIED.

This is a final and appealable order.