**OLIVIA REID, Plaintiff,**

**v.**

**CHRISTOPHER SEEI, PALE SEEI and DIVERSIFIED CONSTRUCTION COMPANY, Defendants.**

High Court of American Samoa
Trial Division

CA No. 42-03

July 22, 2004

Before KRUSE, Chief Justice, LOGOAI, Chief Associate Judge, and ATIULAGI, Associate Judge.

Counsel: For Plaintiff, David P. Vargas
 For Defendants, Marshall L. Ashley

## OPINION AND ORDER

In the spring of 2002, Plaintiff Olivia Reid ("Reid") and Defendant Diversified Company ("Diversified") entered into a construction contract (Ex. 1) for the purpose of building a house. Defendant Pale Seei is the sole proprietor of Diversified, while Defendant Christopher Seei ("Seei") holds himself out as vice president of Diversified. Displeased with Diversified's performance, Reid terminated the contract on June 10, 2003.

On July 1, 2003, Reid brought this complaint against defendants for breach of contract and conversion. Defendants answered and filed a counterclaim for conversion on July 28, 2003.

### Background

Reid and Diversified signed the contract at issue on March 13, 2002. Therein, Diversified promised to provide labor for the construction of a residence in 36 weeks and that "all utilities used during construction will be our [Diversified's] expense." In return, Reid promised to pay Diversified $83,442.60. Because Diversified only had a duty under the contract to provide services, implicitly Reid was made responsible for purchasing and securing construction materials. Diversified only promised to "provide services of closely assisting you [Reid] with procurement of materials." Reid and Diversified apparently contemplated design changes, agreeing that "any additional work desired and/or required will be discussed and agreed upon before proceeding."

They understood that delays might occur, agreeing that "time of completion will be 36 weeks; holidays and unexpected delays due to weather, emergencies, and shipping are not included."

Reid and Diversified fleshed out their mutual obligations with an "Addendum to Builder's Agreement March 13, 2002." Paragraph IV of the addendum reads:

> IV. The Builder warrants to the Owner that all work will be of good quality, free from improper workmanship and defective materials and in conformance with the drawings and specifications. The Builder agrees to correct all work performed by the Builder under this agreement which proves to be defective in material and workmanship within a period of one (1) year.

Diversified started construction on or about March 20, 2002. During construction, Diversified and Reid agreed to numerous changes to the house increasing the contract price to $104,732.87. (*See* Ex. 12.) Changes included extending the family room two feet, adding two feet to one end of the house, adding an attic, and installing a tile roof.

Construction proceeded without significant difficulties, until September 2002, when Reid perceived defects with Diversified's work. She retained the services of Curtis Braniff ("Braniff") to inspect Diversified's work and assure quality. Following Braniff's advice, Reid insisted that Diversified install additional hurricane fasteners to secure the roof to the house, install purlin cleats to fasten down interior parts of the roof, install blocking to support ceiling drywall, and reinforce ceiling joists to strengthen the ceiling. (*See* Ex. 5; Ex. 6.) Diversified completed the requested work. Reid also requested that Diversified install additional nail fasteners to secure roofing tile against hurricane winds. (*See* Ex. 6 (Reid inquiring into additional roof installation procedures).) The manufacturer suggested the use of additional nail fasteners.

During construction, Diversified removed Reid's formwork from her jobsite after using the formwork to set concrete for the house. On October 4, 2002, Reid made note of the missing formwork and threatened to deduct from a future payment to Diversified. (Ex. 5.)

Diversified continued working on the project approximately six months past the initial estimated completion date. Diversified's work was slowed by changes agreed to and corrections identified by Braniff. Reid continued to make payments to Diversified until June 6, 2003. (Ex. 11.)

On May 31, 2003, Reid threatened that she would terminate the contract unless Diversified performed to her satisfaction in the next week. (Ex. 8.) Reid terminated the contract on June 10, 2003. (Ex. 9.) Reid ordered Diversified to cease work and to vacate the premises without their tools. At the time, additional nails had not been installed to secure the roof tile against hurricane winds and the roof did not fully cover the house. Diversified requested an opportunity to finish the roof. Reid refused the request.

At termination, Diversified lacked the materials to complete the house. Diversified was waiting for roof tiles, molding, and glass windows. Reid returned most of Diversified's tools approximately nine weeks after contract termination.

Reid then had other builders complete the house. Pemerika Gillet ("Gillet"), Reid's husband, supervised the work, including completion of the roof.

Problems between the parties continued after contract termination. Reid discovered defects in the house. Plumbing and exterior plaster developed problems. When Hurricane Heta struck in January 2004, roof tiles blew off of the house and broke. Diversified retained funds that Reid gave it for the purchase of corian countertops that never arrived in American Samoa. In August of 2003, Diversified returned the funds after demand. Reid also had to pay an ASPA power bill for utilities used during construction.

**Discussion**

## I. Termination because of Diversified's Breach

Reid believes that she had proper justification for terminating the contract with Diversified. Finding each of her reasons inadequate, we conclude that she improperly terminated the contract.

██ Any non-performance of a contractual duty constitutes a breach of contract. RESTATEMENT (SECOND) OF CONTRACTS § 235 (1979). When another party materially breaches, the injured party may terminate the contract and sue for damages. *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3rd Cir. 1992). However, some contractual breaches are partial, in which case the injured party retains its duties to perform under the contract. *Id.*; RESTATEMENT (SECOND) OF CONTRACTS § 243 cmt. a; Richard A. Lord, *Williston on Contracts* § 39:30 (4th ed. 2000). An injured party cannot terminate after a partial breach, because the law seeks "to prevent or deter the break-down of contract relations." Marvin A. Chirelstein, *Concepts and Case Analysis in the Law of Contracts*, 118 (2d ed. 1993). A breach is considered partial when the injured party

accepts the benefits of the other party's continued performance and continues to perform under the contract. *S & R Corp.*, 968 F.2d at 376; *Marley Cooling Tower Co. v. Caldwell Energy & Envtl.*, 280 F.Supp.2d 651, 657 (W.D. Ky. 2003); RESTATEMENT (SECOND) OF CONTRACTS § 243 cmt. a, § 246 cmt. a; *Williston on Contracts* § 39:30. When the injured party is not discharged from her contractual duties, the party must continue to perform, but can sue for damages flowing from the breach. *S & R Corp.*, 968 F.2d at 376; RESTATEMENT OF CONTRACTS (SECOND) § 243 cmt. a. In addition, if a deficient performance is cured, the duties of an injured party are not discharged. *Id.* at § 242 cmt. a. The breaching party's cure must not unreasonably delay performance. *Id.*

A. Breach by Unjustified Delay in Performance

■ Reid argues that she had justification to terminate the contract because Diversified performed with unjustified delay. We disagree, concluding that under the terms of the contract completion of the house was not due if essential construction materials were unavailable. The language of the contract excused delay due to shipping of locally unavailable materials and Reid was responsible for delays caused by unavailable materials.

Under Reid's interpretation of the contract, Diversified would be in breach of contract even if they had performed perfectly, but materials were unavailable. We find that the parties did not intend such an interpretation when they formed the contract.

Under the terms of the contract, we conclude that Reid could not expect the house to be completed unless all construction materials required for completion were available. The contract had no provisions for partial completion requirements, or making time of the essence. Reid agreed that delays "due to shipping" materials were not included in the thirty-six week completion time. Materials must be shipped if they are unavailable in the territory. Essentially, completion of the house was not due until the materials required for completion were available.

■ Moreover, Reid was responsible for any delays due to the availability of construction materials. "Delay in the performance of a contract will, as a rule be excused where it is caused by the act or default of the opposite party." *Carter v. Sherburne Corp.*, 315 A.2d 870, 874 (Vt. Sup. Ct. 1974). Reid had the duty to provide construction material because the contract only places responsibility on Diversified to provide labor for building the house and to assist procurement. Thus, it was also her responsibility to ensure that materials availability would not delay completion of the house. Furthermore, Reid was responsible for delays caused by material shortages resulting from her change requests.

Diversified did not breach the contract as a result of delay. Reid failed to provide adequate materials to make completion due. At termination, roof tiles, molding, and glass windows were unavailable. Diversified required the additional materials to complete the house, for the house was not complete with a gaping hole in the roof. Also, materials were unavailable because Reid had changed the plans. She requested a tile roof requiring tiles that needed to be specially ordered and shipped to American Samoa.

B. Breach by Defective and Deficient Work

■ Reid argues that she had justification to terminate the contract because Diversified performed defective and deficient work. Reid did not terminate the contract upon discovery of defective workmanship. She continued to work with Diversified, and maintained the contractual relationship. She continued to pay Diversified after discovering most of the defective workmanship. (Ex. 11.) She received the benefit of Diversified's continued performance until June 10, 2003, after discovering most of the defective workmanship. As a result, Diversified's breach for quality of work is considered to be partial and Reid's duties under the contract continued.

Moreover, any other defective work, not including work on the roof, found after Reid's acceptance of Diversified's work does not show that Diversified performed poor quality work sufficient to provide grounds for termination. First, Reid could not terminate on the basis of defective work that Diversified cured. As discussed, unavailable materials, not the time used for Diversified's cure, caused the delay in the completion due date. Second, we find that overall the work was of good quality, especially after cure. Diversified performed over $90,000.00 worth of work and Reid only claims $678.00 for materials to correct deficiencies.

Any of Diversified's uncured defective work does constitute breach for which Reid will be entitled to damages as specified by the contract. However, she could not terminate the contract after Diversified's performance only constituted partial breach.

C. Breach by Defective Roof Installation

■ Roofing tile failure does not demonstrate shoddy workmanship on the part of Diversified. Diversified accepted the nails to complete installation as suggested by the manufacturer. It was reasonable for Diversified to wait to put in the reinforcing nail fasteners for the roofing tile until they had to complete the rest of the roof when the remaining tile arrived. As Reid denied Diversified an opportunity to complete the roof as it requested, we cannot find Diversified responsible for deficiencies in installing the roof. Reid knew about the roof needing more nail fasteners

before her replacement builders began work on the roof. (Ex. 6.) She assumed responsibility for the completion of the roof when she had her own work crew finish it.

D. Breach by Conversion of Funds and Formwork

Reid argues that she had justification to terminate the contract because Diversified stole her property and converted her money. We disagree.

■ The removal of the formwork from the construction site only constitutes partial breach. Reid made contract payments and accepted work under the contract after discovering that the formwork was missing. Reid acknowledged that the formwork was missing from around her house in October 4, 2002. (Ex. 5.) Reid made payments under the contract until June 6, 2003 and accepted Diversified's work under the contract until June 10, 2003. (Ex. 11.) As a partial breach, the removal of the formwork fails to provide grounds for termination of the contract.

■ Diversified did not convert the funds advanced for the corian countertops. "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." 18 AM. JUR. 2D *Conversion* § 1 (1985). A party can show that another unreasonably withheld possession by demonstrating a refusal to surrender the property after demand. *Id.* at § 47. Reid demanded repayment of the advance funds for corian countertops and received the money. Furthermore, Reid did not show Diversified's intent to dispossess her of her funds. Diversified ordered the tile and materials never arrived.[1] When terminating the contract Reid did not demand the funds, she demanded the corian countertop that had not yet arrived, so Diversified reasonably retained the money in order to pay for the tile upon delivery. (Ex. 9.)

We are concerned about the commingling of Reid's and Diversified's funds in Diversified's bank account. Without further evidence of misuse of funds than presented at trial, however, we are satisfied that no conversion occurred when the money was paid after demand.

E. Breach by Providing an Inadequate Work Crew

Reid argues that she had justification to terminate the contract because Diversified provided an inadequate work crew to complete her house. Reid and Diversified did not agree to a particular work crew size.

---

[1] Reid's two requests for admissions (RFA) do not establish that the corian countertops were never ordered. (*See* RFA ¶ 32, 36, 38.)

Unless the size of the work crew indirectly broke some other contract provision, her arguments do not constitute grounds for termination of the contract. Furthermore, she continued to perform and received the benefits of Diversified's work after knowing the size of the work force used. (Ex. 6 (Reid's complaint about the size of the workforce).)

F. Breach by Bad Faith

The sum of Diversified's partial breaches do not give Reid grounds for termination. We require good faith in a party's performance under a contract. *See Moegalupe v. Mulipola*, 12 A.S.R.2d 105, 107 (Trial Div. 1989). Though Diversified may have made some poor construction decisions, we find that it did not act in bad faith. Also, Reid chose to maintain the contractual relationship despite many of Diversified's breaches.

## II. Damages

A. Diversified's Damages

As we find that Reid did not have sufficient justification to terminate the contract, Reid breached the contract by terminating it. Reid's failure to provide material delayed Diversified's scheduled completion date and disrupted its work on other projects. Diversified is entitled to contractual damages according to its expectations under the contract. However, Diversified failed to prove any expectancy damages, such as lost profits and costs. We accordingly award Diversified nominal damages of $1.00. *See Lindgren v. Betham*, 20 A.S.R.2d 98, 101 (App. Div. 1992).

Concerning Diversified's conversion claim, Diversified also failed to prove damages. Reid kept Diversified from its tools and her replacement builders may have used them. Before trial, most of the tools had been returned. Diversified failed to prove damages from the dispossession and damages for replacement costs for unreturned or broken property. We award therefore Diversified nominal damages of $1.00 for conversion damages. *See Letuli v. Le`i*, 22 A.S.R.2d 77, 85 (Land & Titles Div. 1992). Moreover, Reid has not behaved outrageously or with evil motive, so Diversified is not entitled to any punitive damages. *See id.*

B. Reid's Damages for Defective Workmanship

Reid argues that she is entitled to damages for the repair of deficient work: $678.00 for plaster and plumbing defects and part of $4,800.00 for Gillet's services. She contends that she is entitled to damages because of an implied warranty under common law. *Henggeler v. Jindra*, 214

N.W.2d 925, 926 (Neb. Sup. Ct. 1974). We disagree; her contract in addendum paragraph IV had an express warranty. Under the terms of the contract, she could have made Diversified repair defective workmanship. Instead, Reid chose not to exercise the warranty clause and made the repairs herself. Upholding the warranty, we cannot award monetary damages; to do so would contravene the intent of the parties when making the contract.

C. Reid's Damages for Defective Roof Installation

Reid is not entitled to any damages for roof tile installation. Any problems with roof tile installation are not attributable to Diversified's work. Reid wrongfully terminated the contract, preventing Diversified from finishing the roof. Then, knowing that additional nails were needed to complete the roof, she used her own laborers to finish roofing.

D. Reid's Damages for Completing the House

We find that Reid breached the contract when terminating it. She is not entitled to part of $4,800.00 for Gillet's services or $4,474.13 for other completion costs.

E. Reid's Damages for Conversion of Funds and Formwork

Reid receives no damages for conversion of funds advanced for the corian countertop. As discussed, Diversified did not convert the advanced funds.

Reid is entitled to nominal damages of $1.00 for the formwork cost because she failed to prove value of the formwork when conversion occurred, after it had been used. Reid claims a formwork cost of $2,787.88. (*See* Ex. 16 (purchase receipt).) This cost reflects the purchase cost, not the cost after use. (*Id.*) The cost of the formwork decreased significantly after use. Diversified's behavior fails to entitle Reid to punitive damages. *See Letuli*, 22 A.S.R.2d at 85.

F. Reid's Damages for Costs of Inspection Services

Reid argues that Diversified is responsible for the $2,160.00 cost of Braniff's inspection services. We disagree. She has no contractual basis for this claim.

G. Reid's Damages for Paying the ASPA Bill

Diversified acknowledges its obligation to pay Reid $282.90 for the ASPA Bill of $282.90.

## III. Liability of Seei

██ Seei is an agent of Diversified. As he signed the contract in his capacity as Diversified's vice president, he is not liable to Reid for contractual damages, specifically, the cost of the ASPA power bill. RESTATEMENT (SECOND) OF AGENCY §320 (1958). As he managed the construction site and effectively authorized the formwork to be taken from the site, he is liable to Reid for conversion damages, specifically, the formwork damages. *Id.* at § 349. Finally, Seei is not entitled to any of Diversified's damages award.

### Order

Diversified shall have judgment for damages in the amount of $1.00 for Reid's breach of contract and of $1.00 for Reid's conversion of its tools.

Reid shall have judgment for damages in the amount $1.00 for Defendants' conversion of her formwork and damages of $282.90 for Diversified's failure to pay the ASPA power bill.

It is so ordered.